# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

South Carolina Department of Social Services,
Respondent,

v.

Natalya Pimienta, Gerardo Pimienta, and Serge Palatkin,
Defendants,

Of whom Gerardo Pimienta is Appellant.

Appellate Case No. 2025-000590

———————————

Appeal from Dorchester County
Mandy Wilkerson Kimmons, Family Court Judge

———————————

Opinion No. 28345
Heard January 13, 2026 – Filed July 31, 2026

———————————

**AFFIRMED**

———————————

Gregory Samuel Forman, of Gregory S. Forman, PC, of
Charleston, for Appellant Gerardo Pimienta.

Jillian D. Ullman, of Charleston, and Alwyn Taylor Silver,
of Georgetown, both for Respondent South Carolina
Department of Social Services.

Jessica Leigh Birt, of Summerville, for Guardian Ad
Litem Abigail Luftig. Serge Palatkin and Natalya
Pimienta, both of Summerville, Defendants pro se.

———————————

**JUSTICE JAMES:** This direct appeal arises from a family court order finding by the preponderance of the evidence that Gerardo Pimienta (Appellant) committed a sexual offense against his then-stepdaughter, AP, and finding that AP is an abused and/or neglected child as defined by South Carolina law. As a result, the family court ordered Appellant to be placed on the Central Registry of Child Abuse and Neglect (the Central Registry). Appellant argues the family court erred in finding he sexually abused AP. Appellant also contends the preponderance of the evidence burden of proof imposed by South Carolina Code subsections 63-7-1650(A) (2010) and 63-7-1660(E) (2010) is unconstitutionally low and that a clear and convincing burden is constitutionally required. We hold the preponderance of the evidence burden of proof set forth in South Carolina Code subsection 63-7-1650(E) (2010) is constitutional. We also affirm the family court's decision on the merits.

## I. Background

In December 2022, the South Carolina Department of Social Services (DSS) received a report alleging Appellant inappropriately touched his then-stepdaughter, AP, in August 2020. At the time of the alleged abuse, AP was twelve years old, and Appellant was married to and living with AP's mother, Defendant Natalya Pimienta (Mother). Appellant and Mother separated around a year later. Mother is also divorced from AP's father—Defendant Serge Palatkin (Father).

In January 2023, DSS indicated against Appellant for sexual abuse, and after Appellant appealed, the indication was upheld by the DSS Dorchester County Director. In May 2023, DSS petitioned the family court pursuant to South Carolina Code section 63-7-1650 to intervene on behalf of three minor children—AP, IP (the second daughter of Mother and Father), and DP (the son of Mother and Appellant)— and asked the family court to find the minor children were abused and/or neglected children. DSS also requested the family court order Appellant be placed on the Central Registry on the ground that Appellant sexually abused AP. DSS's complaint alleged Appellant touched AP "underneath her pants and above her underwear on her vagina . . . ." At the time of the complaint, Father had been granted temporary custody of AP and IP in a private action.

The family court heard the case in February 2025. Appellant submitted a pre-hearing memorandum arguing the preponderance of the evidence burden of proof found in South Carolina Code subsections 63-7-1650(A) and 63-7-1660(E) violates due process. Appellant requested the family court require DSS to prove its allegations by clear and convincing evidence.

No physical evidence of abuse was presented at the hearing. The first witness was AP, who was one week away from turning 17 at the time. AP testified that in 2020, while she and her younger sister were watching the live action Lion King movie in her bed with Appellant, "[Appellant's] hand went in under [her] shorts, under [her] underwear, and started touching . . . [her private parts]." AP testified the touching lasted "a minute or two" and Appellant stopped after a "few times of asking him to stop." While AP testified the touching occurred underneath her underwear, the DSS complaint alleged the touching was above her underwear. AP testified she believed the DSS case worker mistakenly recorded what AP told her.

AP testified she told Mother about the touching the next morning, and Mother called Appellant. According to AP, Appellant apologized over the phone to AP for making her feel uncomfortable and told her he was drunk at the time. AP also testified Appellant came home after the phone call, hugged AP, and at the time, AP forgave him because she "wanted to just pretend this was just a drunk accident and let him move on" and "just wanted everything to go back to normal." AP further testified she asked Mother not to tell the police because she "had witnessed a divorce before [and] did not want to see the family split up anymore" and she was "just a scared little kid." AP told her therapist about the touching in 2022 and the therapist reported the allegations to DSS. Soon after, AP also told Father, and he reported the allegations to law enforcement.

During cross-examination of AP, Appellant presented AP with a series of photographs featuring her and Appellant allegedly from around the same time as the incident, but AP could not testify as to when the photographs were taken. AP testified that after the incident, she was uncomfortable being around Appellant, but she was "just masking it and trying to act as if nothing happened" and "in order to prevent the whole family splitting up . . . [she] tried to act [] casual as if it didn't happen." AP also testified she might have looked comfortable in the photographs with Appellant, but she "wouldn't be showing any discomfort in photos. I've learned to smile for them every single time."

DSS family preservation case manager Myashia Carter testified DSS was seeking a finding of sexual abuse against Appellant but was not requesting a treatment plan for Appellant, a change in the custody plan of any children, or a finding against Mother for failing to protect AP from Appellant. Carter also testified DSS was aware that DP, Appellant and Mother's minor male son, stayed with Appellant, but that DSS had no concerns regarding that child. Carter further testified Father filed a private action and was granted custody of AP and IP in February 2023.

Appellant called Mother to testify.  Mother testified the incident occurred in August 2020 and AP told her the next day but requested Mother not report it because "she would like to forget about anything that happened."  Mother testified she asked AP many times if she would like to report the incident.  At the time, Mother was subject to a court order requiring her to inform Father of important updates regarding AP, and Mother testified she was aware of the potential contempt sanctions for violating this order, but she did not tell Father because AP did not want her to.  Mother testified that at the time, she thought it was an "accidental touch," but she conceded AP told her the touch was not accidental when she first informed Mother.  Mother testified Appellant told AP over the phone, "Sorry if I touched you by accident," and AP and Appellant "hugged it out" and she "thought everything was fine."  Mother further testified Appellant might have had a drink or two on the day of the incident but was not intoxicated.

Appellant presented Mother with the aforementioned photographs featuring AP and Appellant allegedly from around the time of the incident.  Mother testified it did not look like AP was faking her smile.  Mother confirmed a photograph was taken of AP, her sister, and her half-sister in the bed with Appellant shortly after the alleged touching would have occurred.  Mother testified she thought the photograph was "cute" and from the image, she did not think sexual abuse had just occurred, but she noted Appellant could have accidentally touched AP's underwear or pants.  Mother testified neither of the two other children in the photograph reported the touching to her nor were they upset that night.  Mother further testified she had no concerns about Appellant abusing any of her children, including the son they have together.  Mother testified the allegations reemerged almost two and a half years later when AP began expressing a desire to live with Father.  Mother testified that, at that time, she and Appellant had been separated and had been living apart for around a year.  Mother testified she believed Father was brainwashing AP because AP started acting differently and talking about the allegations against Appellant once AP moved in with Father.  Mother also testified AP's story changed over time, including the duration of the touching—ranging from "the hand was kind of place[d] there and then it was off" to "it went to as far as five to seven minutes."

Appellant testified last.  Appellant testified he has nine children—seven girls and two boys.  Appellant testified he had two drinks the day of the alleged incident during dinner with his employees, but he was not intoxicated and he did not tell Mother he was drunk at the time.  Appellant testified AP misunderstood what happened and that he may have touched her when pushing up to get out of the bed to take a shower; however, he did not remember touching her and did not remember AP asking him to stop.  Appellant further testified he did not touch AP

inappropriately, even accidentally, and did not deliberately reach into her pants or touch her underwear. Appellant testified the picture of him and the girls in the bed was taken shortly after the alleged incident allegedly occurred. Appellant testified he did not hear about the alleged incident again until AP reported the incident to her therapist over two years later.

In March 2025, the family court issued an Order of Intervention and Order Closing Case pursuant to South Carolina Code section 63-7-1650. The family court found Appellant failed to meet his burden of showing the statutory preponderance of the evidence burden of proof is unconstitutional. The family court found the allegations against Appellant were supported by a preponderance of the evidence, including that AP is an abused and/or neglected child as defined in South Carolina Code section 63-7-20 (Supp. 2025). The family court found Appellant committed a sexual offense as defined by South Carolina law but did not specify what sexual offense Appellant committed. The family court found AP to be credible. The family court ordered Appellant to be placed on the Central Registry and closed the case. The family court also noted DSS was not seeking a finding against Mother and that custody of AP, IP, and DP was to remain as previously ordered.

Appellant appealed directly to this Court. He challenges the constitutionality of the preponderance burden of proof imposed by South Carolina Code subsections 63-7-1650(A) and 63-7-1660(E), and he challenges the family court's finding that he sexually abused AP.

## II. Discussion

## A. Constitutionality

DSS has a statutory duty to investigate all reports of suspected child abuse and neglect. S.C. Code Ann. § 63-7-920 (Supp. 2025). South Carolina Code subsection 63-7-1650(A) provides that upon investigation or at any time during the delivery of services by DSS, "[DSS] may petition the family court for authority to intervene and provide protective services without removal of custody if [DSS] determines by a preponderance of evidence that the child is an abused or neglected child and that the child cannot be protected from harm without intervention." S.C. Code Ann. § 63-7-1650(A). The family court must hold a hearing to determine whether intervention is necessary. S.C. Code Ann. § 63-7-1650(C). "Intervention and protective services must not be ordered unless the court finds that the allegations of the petition are supported by a preponderance of the evidence including a finding that the child is an abused or neglected child as defined in Section 63-7-20 and the child cannot be protected from further harm without intervention." S.C. Code Ann.

§ 63-7-1650(E). According to the South Carolina Children's Code, "'[p]reponderance of evidence' means evidence which, when fairly considered, is more convincing as to its truth than the evidence in opposition." S.C. Code Ann. § 63-7-20(22) (Supp. 2025).

Appellant argues the preponderance of the evidence burden of proof set forth in South Carolina Code subsections 63-7-1650(A) and 63-7-1660(E) is unconstitutionally low. However, neither of these subsections applies to this case. As discussed above, subsection 63-7-1650(A) prescribes the burden for DSS during its internal determination of abuse or neglect before it may petition the family court. Appellant does not challenge the burden the family court is to apply in the type of action before us—an intervention proceeding as found in South Carolina Code subsection 63-7-1650(E). Furthermore, the other statute challenged by Appellant, subsection 63-7-1660(E), provides the family court is to apply a preponderance of the evidence burden in removal cases, but this is not a removal case. Therefore, Appellant did not challenge the correct statute.[1]

However, even if Appellant had properly challenged the constitutionality of the preponderance burden of proof in South Carolina Code subsection 63-7-1650(E), we hold that burden of proof is constitutional. An appellate court reviews a lower court's legal and constitutional conclusions de novo. *Owens v. Stirling*, 443 S.C. 246, 264, 904 S.E.2d 580, 589 (2024). "A legislative act will not be declared unconstitutional unless its repugnance to the constitution is clear and beyond a reasonable doubt." *Joytime Distribs. & Amusement Co. v. State*, 338 S.C. 634, 640, 528 S.E.2d 647, 650 (1999) (citing *Westvaco Corp. v. S.C. Dep't of Revenue*, 321 S.C. 59, 62, 467 S.E.2d 739, 741 (1995)). This general presumption of validity can be overcome only by a clear showing the act violates some provision of the constitution. *Id.* "The party challenging the validity of a statute bears the burden of proving it is unconstitutional." *Powell v. Keel*, 433 S.C. 457, 461, 860 S.E.2d 344, 346 (2021). The Due Process Clause of the Fourteenth Amendment provides that

---

[1] Appellant also challenges the entry of his name in the Central Registry. South Carolina Code subsection 63-7-1940(A)(1)(b) (Supp. 2025) states that "[a]t a hearing pursuant to Section 63-7-1650 . . . at which the court . . . finds that the child was abused or neglected, the court shall order, without possibility of waiver by the department, that a person's name be entered in the [Central Registry] if the court finds that there is a preponderance of evidence that the person . . . sexually abused the child[.]" However, Appellant failed to challenge the statutory preponderance of the evidence burden of proof required for entry in the Central Registry in cases of sexual abuse.

"[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1; *see also* S.C. Const. art. I, § 3 (providing no person shall "be deprived of life, liberty, or property without due process of law").

Appellant primarily relies on *Santosky v. Kramer*, 455 U.S. 745 (1982), to argue due process requires a "clear and convincing evidence" burden of proof in this case.  In *Santosky*, the Supreme Court of the United States analyzed a New York statute that provided the State of New York may terminate, over parental objection, the rights of parents in their natural child upon a finding by the "fair preponderance of the evidence" that the child is permanently neglected.  *Id.* at 747.  At the time of the *Santosky* case, New York authorized its officials to temporarily remove a child from the home if the child appeared "neglected."  *Id.* at 748.  After the child had been in the care of an authorized agency for more than one year, if the State was convinced that "positive, nurturing parent-child relationships no longer exist," then the State could initiate "permanent neglect" proceedings to free the child for adoption.  *Id.*  If the State supported its allegations by a "fair preponderance of the evidence," the child could be declared permanently neglected—which would empower the family court to permanently terminate the natural parent's rights in the child.  *Id.* at 748-49.  The termination of parental rights would deny the natural parents "physical custody, as well as the rights ever to visit, communicate with, or regain custody of the child."  *Id.* at 749.  In determining whether New York's "fair preponderance of the evidence" burden in those circumstances was constitutional, the *Santosky* Court held that before a state may "sever completely and irrevocably the rights of parents in their natural child, [the Due Process Clause of the Fourteenth Amendment] requires that the State support its allegations by at least clear and convincing evidence."  *Id.* at 747-48.

At the start of its analysis, the *Santosky* Court clarified that the central questions before the Court were "whether process is constitutionally due *a natural parent at a State's parental rights termination proceeding*, and, if so, what process is due."  *Id.* at 753 (emphasis added).  The *Santosky* Court explained that when the State initiates a parental rights termination proceeding, it seeks to permanently end a parent's fundamental liberty interest in a child, because once affirmed on appeal, a New York decision terminating parental rights is final and irrevocable.  *Id.* at 759.  The *Santosky* Court explained the Court has engaged in a "straight-forward consideration of the factors identified in [*Mathews v. Eldridge*, 424 U.S. 319 (1976)] to determine whether a particular standard of proof in a particular proceeding satisfies due process."  *Id.* at 754.  These factors are (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and

(3) the countervailing governmental interest supporting use of the challenged procedure. *Id.* at 754 (citing *Eldridge*, 424 U.S. at 335). The *Santosky* Court held that in parental rights termination proceedings, "the private interest affected is commanding; the risk of error from using a preponderance standard is substantial; and the countervailing governmental interest favoring that standard is comparatively slight[; therefore,] [e]valuation of the three *Eldridge* factors compels the conclusion that use of a 'fair preponderance of the evidence' standard in such proceedings is inconsistent with due process." *Id.* at 758. Based on this analysis, the *Santosky* Court held the "fair preponderance of the evidence" standard in permanent termination of parental rights cases violated the Due Process Clause of the Fourteenth Amendment, and a "clear and convincing" burden is constitutionally mandated. *Id.* at 768-69.

*Santosky* is readily distinguishable from the case before us, primarily because this is not a termination of parental rights case. In termination of parental rights cases, South Carolina courts have adhered to *Santosky* and applied the clear and convincing burden of proof. *See S.C. Dep't of Soc. Servs. v. Cochran*, 364 S.C. 621, 626-27, 614 S.E.2d 642, 645 (2005) ("The termination of the legal relationship between natural parents and a child presents one [of] the most difficult issues this Court is called upon to decide. We exercise great caution in reviewing termination proceedings and will conclude termination is proper only when the evidence clearly and convincingly mandates such a result . . . . [T]he termination of parental rights [is] one of [the] most severe actions a state can take against its citizens . . . .").

However, in an intervention action in South Carolina, a finding by the preponderance of the evidence that a child is an abused or neglected child does not, by itself, allow the family court to terminate parental rights. Instead, such a finding permits the family court to order intervention and protective services (S.C. Code Ann. § 63-7-1650(E)) or review and approve a treatment plan designed to alleviate any danger to the child and to aid the parents so that the child will not be endangered in the future (S.C. Code Ann. § 63-7-1670(A) (2010)). Unlike the termination of parental rights, none of these outcomes sever all contacts between the parent and child, nor are the outcomes final and irrevocable, nor will the outcomes result in an "irretrievable destruction of [] family life." *See Santosky*, 455 U.S. at 753. Therefore, the nature of the interests in an intervention proceeding significantly differ from those in a termination of parental rights proceeding. Simply put, intervention proceedings do not affect a natural parent's liberty interest in the parent-child relationship to the same constitutionally significant degree as does a termination proceeding. The *Santosky* Court even recognized "persons faced with forced dissolution of their parental rights have a more critical need for procedural

protections *than do those resisting state intervention into ongoing family affairs.*" *Id.* (emphasis added). Therefore, *Santosky* is not applicable to the instant case. *See In re Cochise Cnty. Juv. Action No. 5666-J*, 133 Ariz. 157, 650 P.2d 459 (1982) (holding a preponderance of the evidence is the proper burden of proof in a dependency proceeding determining whether a child is abused or neglected because the *Santosky* mandate of a "clear and convincing" burden of proof is limited to parental severance cases in which the termination of parental rights is irrevocable); *Wright v. Arlington Cnty. Dep't of Soc. Servs.*, 9 Va. App. 411, 388 S.E.2d 477 (Ct. App. 1990) (holding preponderance of the evidence is the appropriate burden of proof for an abuse and neglect proceeding which may lead to temporary placement of the child because the due process clause does not require use of a clear and convincing burden in such proceedings as opposed to permanent termination of residual parental rights proceedings). In addition, we note Appellant has no parental rights as to AP (his former stepdaughter), so his arguments concerning such rights are unavailing in the first instance.

Because DSS was not seeking a termination of parental rights in the instant case, and because Appellant has no parental rights over AP, we hold the preponderance of the evidence burden set forth in South Carolina Code subsection 63-7-1650(E) is constitutional.

## B. Family Court's Findings

On appeal from the family court, appellate courts review factual and legal issues de novo. *Klein v. Barrett*, 427 S.C. 74, 79, 828 S.E.2d 773, 776 (Ct. App. 2019) (citing *Stoney v. Stoney*, 422 S.C. 593, 596, 813 S.E.2d 486, 487 (2018)). "[D]e novo review neither relieves an appellant of demonstrating error nor requires [the appellate court] to ignore the findings of the family court." *Lewis v. Lewis*, 392 S.C. 381, 389, 709 S.E.2d 650, 654 (2011). The appellate court generally defers to the findings of the family court regarding credibility because the family court is in a better position to observe the witness and his or her demeanor. *S.C. Dep't of Soc. Servs. v. Scott*, 438 S.C. 400, 412, 883 S.E.2d 229, 235 (Ct. App. 2023) (citing *Lewis*, 392 S.C. at 385, 391, 709 S.E.2d at 651-52, 655). The party contesting the family court's decision bears the burden of demonstrating the family court's factual findings are not supported by the preponderance of the evidence. *Lewis*, 392 S.C. at 388-89, 709 S.E.2d at 653-54; *see also Stoney*, 422 S.C. at 595, 813 S.E.2d at 487 ("[D]e novo review allows an appellate court to make its own findings of fact; however, this standard does not abrogate two long-standing principles still recognized by our courts during the de novo review process: (1) a trial judge is in a superior position to assess witness credibility, and (2) an appellant has the burden of showing the

appellate court that the preponderance of the evidence is against the finding of the trial judge.").

Therefore, Appellant must establish that the family court's factual findings that Appellant sexually abused AP and that AP is an abused and/or neglected child are not supported by a preponderance of the evidence. We hold Appellant has failed to do so.

As discussed above, "[i]ntervention and protective services must not be ordered unless the court finds that the allegations of the petition are supported by a preponderance of the evidence including a finding that the child is an abused or neglected child as defined in Section 63-7-20 and the child cannot be protected from further harm without intervention." S.C. Code Ann. § 63-7-1650(E). "'Preponderance of evidence' means evidence which, when fairly considered, is more convincing as to its truth than the evidence in opposition." S.C. Code Ann. § 63-7-20(22) (Supp. 2025). South Carolina Code subsection 63-7-20(6)(a)(ii) provides that "[c]hild abuse or neglect" or "harm" occurs when "the parent, guardian, or other person responsible for the child's welfare" . . . "commits or allows to be committed against the child a sexual offense as defined by the laws of this State . . . ." S.C. Code Ann. § 63-7-20(6)(a)(ii) (Supp. 2025). Under South Carolina Code subsection 16-3-655(C), an individual is guilty of criminal sexual conduct with a minor in the third degree if the individual "wilfully and lewdly commits or attempts to commit a lewd or lascivious act upon or with the body, or its parts, of a child under sixteen years of age, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of the actor or the child." S.C. Code Ann. § 16-3-655(C) (2015).

Appellant contends that even under the preponderance of the evidence standard, DSS did not prove Appellant sexually abused AP. Appellant points to Mother's testimony that AP's recollection of events changed over time, AP was not forcing a smile in the photographs, and the other girls in the bed did not report the incident. Appellant contends the photographs show AP was comfortable around Appellant following the incident. Appellant also argues that while the family court found AP to be credible, none of the people tasked with protecting AP from Appellant acted as though the abuse had actually taken place, such as Mother making no attempt to keep Appellant from the children and DSS not seeking a treatment plan or removal of Appellant's other children.

This is admittedly a close question, as conflicting evidence was presented to the family court; however, AP's testimony is more convincing than the testimony presented by Appellant. The family court was in the best position to determine the

credibility of AP, Mother, and Appellant, and the family court expressly found AP to be credible. The family court observed the demeanor of the witnesses, and we agree with the family court's credibility findings. AP remembered what movie she was watching at the time of the incident, and Mother and Appellant both testified it was the same movie. AP testified as to the sexual nature of the touching, and Mother testified AP told her the touching was not accidental the day after the incident. The family court noted she did not believe AP "would have confused an accidental touching with [Appellant] touching her private area for a duration of such length that she had time to ask him to stop a few times." The family court further found AP's testimony regarding how after the incident she tried to act as if nothing had happened to prevent the family from splitting up was credible and noted AP "seemed to take no joy in testifying about this incident."

The family court also found AP to be more credible than Mother. AP told Mother the day after the incident that Appellant had inappropriately touched her and that it was not an accident. Mother failed to report the incident to Father as was required by court order, and she did not contact DSS or law enforcement. Mother then allowed AP to live with her and Appellant for another year after AP and Appellant "hugged it out;" however, Mother testified she continued to ask AP many times if she would like to report the incident. We agree with the family court's finding as to Mother's lack of credibility because of Mother's self-serving motive to place her lack of action in the best possible light because of potential criminal and contempt penalties.

As to the photographs introduced by Appellant, we agree with the family court that the photographs are not convincing to show Appellant did not sexually abuse AP. The photographs were handpicked by Appellant in support of his case, and AP herself testified she looked comfortable in the photographs. At the time, AP was a twelve-year-old girl who had already gone through the divorce of Mother and Father, and as the family court found, AP's testimony about desiring everything to be normal and not wanting her family to split up again was credible.

In conclusion, we hold Appellant has not met his burden of showing that the family court's factual findings were not supported by a preponderance of the evidence.

### III. Conclusion

We hold the preponderance of the evidence burden set forth in South Carolina Code subsection 63-7-1650(E) is constitutional. We further hold Appellant has not

met his burden of showing that the family court's factual findings were not supported by a preponderance of the evidence.  Therefore, we affirm the family court's order.

**AFFIRMED.**

**HILL and VERDIN, JJ., concur.  FEW, J., dissenting in a separate opinion in which KITTREDGE, C.J., concurs.**

**JUSTICE FEW:** I respectfully dissent. As the majority indicates, the standard by which appellate courts review the factual findings of the family court is "de novo." *Stoney v. Stoney*, 422 S.C. 593, 594, 813 S.E.2d 486, 486 (2018). This standard contemplates that the appellate court will "make its own findings of fact." 422 S.C. at 595, 813 S.E.2d at 487. Applying this standard to the evidence in this case, I would hold the Department of Social Services failed to prove Gerardo Pimienta committed a sexual offense against his stepdaughter. I would reverse the family court on this point and not reach the constitutional question.

The majority has given us an extensive account of the evidence DSS presented to the family court. A careful reading of the majority opinion reveals the case against Pimienta is quite weak. The majority is being generous when it calls this "admittedly a close question." I do not believe it is close.

My first point is the family court did not clearly identify the act it found Pimienta committed. The central issue in the case was whether the incident was accidental or intentional. The family court discussed the level of intent required in a motion hearing during trial, but made no finding of intent in the order. The alleged victim (AP) also was not clear on exactly what happened. Initially, AP told her mother the touching was quick and occurred on the outside of her underwear. At the hearing, however, she testified Pimienta had his hand under her underwear for a minute or two while she repeatedly asked him to stop.

My second point concerns the behavior and testimony of AP's mother. AP told her about the incident the day after it occurred. The mother promptly called Pimienta on the phone and the three of them discussed what happened. Pimienta then returned home and hugged AP. Based on these observations, the mother concluded that whatever occurred was accidental. Her conclusion might not ordinarily be important, but it is important here because she was subject to a court order that would have required her to report anything like sexual abuse to the child's father. The mother appears to have confirmed her conclusion there was no intentional sexual abuse as she observed AP and Pimienta interact over the next few days and weeks. To demonstrate this, Pimienta's counsel showed her photographs of AP and Pimienta closely interacting during this time. The photographs showed AP was smiling and appeared comfortable with Pimienta. When specifically asked whether AP's smile in those photographs appeared genuine or fake, the mother stated she knew her daughter could fake a smile but she was not faking the smile in those photographs. The mother's conclusion Pimienta did not sexually abuse AP is also confirmed by the fact she voiced no concerns over him continuing to live in the home with AP and other minor children, including their own son DP. In fact, the mother testified she

had "no concerns" that Pimienta might abuse any of her children, and Pimienta lived with her and AP for over a year after the incident.

The mother also testified AP said nothing else of the incident for over two years. AP herself confirmed this in her testimony. During the second year, the mother and Pimienta separated and Pimienta moved out of her home. It was during this period of time when—the mother testified—AP's story began to change. The mother testified that initially AP told her the incident was short—"the hand was kind of placed there and then it was off"—but later AP told her it lasted "as far as five to seven minutes." At some point, AP decided she wanted to go live with her biological father. When the mother was asked, "When did she first start indicating she would prefer to live with her dad," the mother responded it was "right before" AP wanted to go public with the accusation against Pimienta. I find this critical to analyzing AP's credibility: AP said nothing about the incident for over two years except that she did not want the incident to be revealed, but then the minute she decided she wanted to live with her biological father, she insisted on revealing—even embellishing—an incident that made her mother look bad.

My third point is that AP's ultimate version of what occurred is inconsistent with the fact at least one other child was present when the incident occurred, but the other children said nothing about seeing or hearing anything out of the ordinary. These children were shown in photographs with Pimienta acting normally only minutes afterwards.

The family court made a finding that AP was credible, and we would normally defer to that credibility finding. *Stoney*, 422 S.C. at 595, 813 S.E.2d at 487. I would not defer to the family court in this case, however, because the evidence I have just discussed and other evidence recited by the majority clearly indicates the incident was an accidental touching. To me, the evidence clearly indicates the child later consciously embellished her story for the purpose of obtaining the custody situation she wanted—to live with her father.

For these reasons, I would reverse the family court's finding that Pimienta committed a sexual offense against AP.

**KITTREDGE, C.J., concurs.**